**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

**Docket No. 05-10111 DPW**

---

**HOSTAR MARINE TRANSPORT SYSTEMS, INC.**
     **Plaintiffs,**

     **v.**

**UNITED STATES OF AMERICA**
     **Defendants**

---

**THE PLAINTIFF, HOSTAR MARINE TRANSPORT SYSTEMS, INC.'S**
**OPPOSITION TO THE UNITED STATES'S MOTION TO DISMISS**

The Plaintiff, Hostar Marine Transport Systems, Inc. ("Hostar"), opposes the United States' motion to dismiss as follows:

As is more fully discussed in the Plaintiff's Memorandum in Support of this Motion, Hostar has filed a two count complaint. The first count requests a refund of sums offset by the United States and was filed in accord with specific instructions provided by the United States.  The second count, which is not predicated on the first count as has been incorrectly stated by the United States, requests relief for the United States violation of its duty of consistency and for violations of the Plaintiff's equal protection rights.

The Plaintiff's complaint properly stands.

For these reasons, the Plaintiff prays this honorable Court to:

1.    Deny the United States Motion to Dismiss;

2.    Award reasonable attorney's fees and costs;  and,

3.    Any and all other remedies that this honorable Court deems appropriate.

Hostar Marine Transport
Systems, Inc., by its
attorney,


 /s/ Timothy Burke
Timothy Burke
Burke & Associates
400 Washington Street
Braintree, MA 02184
(781)-380-0770

Dated:    March 29, 2005


CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon each attorney of record via first class mail on March 29, 2005.

 /s/ Timothy Burke


**UNITED STATES DISTRICT COURT**

FOR THE DISTRICT OF MASSACHUSETTS

Docket No. 05-10111 DPW

_____

**HOSTAR MARINE TRANSPORT SYSTEMS, INC.**
 **Plaintiffs,**

 **v.**

**UNITED STATES OF AMERICA**
 **Defendants**

_____

<u>**THE PLAINTIFF, HOSTAR MARINE TRANSPORT SYSTEMS, INC.'S
MEMORANDUM IN SUPPORT OF HIS OPPOSITION TO THE UNITED
STATES'S MOTION TO DISMISS**</u>

**I. <u>Procedural History and Facts.</u>**

The Plaintiff has filed a complaint with this honorable Court requesting relief from the actions of the United States in erroneously assessing tax against it and for violations of its due process rights.

The Plaintiff, Hostar Marine Transport Systems, Inc. ("Hostar"), has been erroneously assessed excise tax pursuant to IRC §4061(a)(the "Excise Tax").

Hostar is a manufacturer of hydraulic boat trailers ("hydraulic boat trailers") for use in marinas and boat yards. Hostar's hydraulic boat trailers are used by restorers, dealers and manufacturers.

Hydraulic boat trailers are designed to launch and retrieve boats from the water, to move boats into and out of repair facilities and paint booths, to move them about a boat yard, yacht club, marina or boat dealership, and to set boats on

keel blocking and boat stands for winter storage.

Hydraulic boat trailers can only function because of their completely open-center design, a "wishbone" or "tuning fork" type of trailer, having stub axles with no permanently welded cross beams.  Stub axles attach a single wheel to the trailer as opposed to the more common through axles which attach two wheels.  Through axles are used on highway transport trailers.

Hydraulic trailers are constructed with stub axles mounted under or outboard of the trailer frame.  This design enables the operations of ramp launching, retrieving and setting a boat on the ground, in a repair facility or in a storage building.  The main function or purpose of a hydraulic trailer is not that of highway transporting.

Almost all highway transporting of boats is done on lowboy trailers which are similar to trailers for moving construction equipment.  Lowboy trailers have through axles and a full bed or welded cross beams, are not submersible and have no hydraulic power units, pumps, cylinders and controls.

Boat manufacturing companies use lowboy types of trailers for the transportation of boats to boat dealers.

Hostar does not build lowboy trailers.

Hostar manufactures four model's of trailers HPT, HST, HSTY, HI1T.  Models HPT, HST & HI1T are capable of on-road use.

2

The HSTY is incapable of on-road use.

A hydraulic boat trailer is equipment, similar to a marine hoist in a boatyard.  The expense of its hydraulic pumps, motors, controls, cylinders, special axles, etc., and the resulting costs to maintain them make Hostar's trailers economically unfeasible for hauling boats when compared to the lowboy trailers.

IRC Section 4051 (a)(1) imposes a twelve percent (12%) excise tax on the first retail sale of certain articles including automobile truck chassis and bodies.

Section 145.4051-1(a)(2) of the Temporary Excise Tax Regulations provides that a chassis or body is taxable under section 4051 (a)(1) only if such chassis or body is sold for use as a component part of a highway vehicle (as described in Section 48.4061(a)-1(d) of the Manufacturers and Retailers Excise Tax Regulations).

Regulation 48.4061(a)-l(d)(1) defines a "highway vehicle" as any self-propelled vehicle, or any trailer or semitrailer, designed to perform a function of transporting a load over public highways, whether or not also designed to perform other functions.  For the sole purpose of determinations under this paragraph (d)(2)(ii), where there is affixed to the vehicle equipment used for loading, unloading, storing, vending, handling, processing, preserving, or otherwise caring for a load

3

transported by the vehicle over the public highways, the functions are related to the transportation of a load over the public highways even though such functions may be performed off the public highways.

Regulation 48.4061 (d)(2)(i) Exempts Hostar's Hydraulic Boat Trailers from the Imposition of Excise Tax.

Regulation 48.4061(d)(2)(i) ("Regulation (i)") exempts from taxation a trailer (or chassis) if (A) machinery or equipment has been affixed to perform a function unrelated to transportation on or off the public highways, (B) the chassis has been specially designed to serve only as a mobile carriage and mount for the particular equipment involved and (C) is of a special design where it could not be used to transport any load other than that particular machinery or equipment or similar machinery or equipment requiring such a specially designed chassis.

The first test of Regulation (i) is that machinery or equipment be affixed to the trailer to perform a function unrelated to transportation on or off the highway. As stated above, Hostar's Hydraulic Boat Trailers are designed to launch and retrieve boats from the water, to move boats into and out of repair facilities and paint booths, to move them about the boat yard, yacht club, marina or boat dealership, and to set them on keel blocking and boat stands for winter storage. Also, the

4

Trailers have hydraulic power units, pumps, cylinders and controls affixed to it. All of these functions of Hostar's Hydraulic Boat Trailers are separate and unrelated to transportation on or off the highway which thereby establishes the first test.

The second and third tests of Regulation (i) require that the trailers be specially designed to serve only as a mobile carriage for the particular equipment involved and cannot be used to transport any load other than that particular equipment.

Rev. Rul. 79-423, 1979-2 C.B. 386, states that a chassis meets the part (C) test of section 48.4061(a)-l(d)(2)(i) if it has been specially designed to hold certain job site machinery or equipment, to the extent that it is substantially structurally different than a chassis that would ordinarily be used for transporting a load other than that particular machinery or equipment or similar machinery or equipment requiring such a specially designed chassis.

Since Hostar's Hydraulic Boat Trailers are specially designed to be a mobile carriage for boats and cannot be used to transport equipment other than boats, the Trailers meet the second and third tests of Regulation (i).

Regulation 48.4061(d)(2)(ii) Exempts Hostar's Trailers from the Imposition of Excise Tax.

Regulation 48.4061(d)(2)(ii) ("Regulation ii") states that a trailer (or chassis) is not a highway vehicle if it is (A) specially designed for the primary function of transporting a particular type of load other than over the public highway and (B) if by reason of such special design, the use of such vehicle to transport such load over the public highways is substantially limited or substantially impaired.

The primary function of Hostar's Hydraulic Boat Trailers is for use in boat yards and rarely on the highway due to the cost and highly specialized nature of the equipment.

On or about May 18, 2000 Hostar was assessed additional tax pursuant to IRC Section 4051 for tax periods ended: March 1994, June 1994, June 1995, September 1995, December 1995, March 1996, June 1996, September 1996 and December 1996.

On or about January 1, 2001 the Internal Revenue Service applied Hostar's overpayment credit in the amount of $215.20 to the additional tax assessed pursuant to IRC Section 4051 for tax period ended June 1994.

On or about July 31, 2001 the Internal Revenue Service applied Hostar's overpayment credit in the amount of $55.91 additional tax assessed pursuant to IRC Section 4051 for tax period ended March 1994 making the total for the two tax periods $271.11.

On or about January 16, 2003 the Internal Revenue

6

Service denied Hostar's claim for adjustment to tax and notified same of its right to file suit in the United States District Court (Please See Exhibit 1).

Hostar has a number of competitors in the United States and Canada that manufacture Hydraulic Boat Trailers.

Upon information and belief Hostar is the only manufacturer of Hydraulic Boat Trailers whose Hydraulic Boat Trailers have been deemed by the Internal Revenue Service to not qualify for exemption pursuant to Regulations 48.4061(d)(2)(i) and 48.4061(d)(2)(ii).

Upon information and belief the Internal Revenue Service is aware of the name and location of manufacturers of Hydraulic Boat Trailers, including a Canadian manufacturer, that represent to their customers that their Hydraulic Boat Trailers are not subject to Excise tax.

The assessment against Hostar was improperly discriminatory, as well as an violation of Hostar's equal protection rights.

**II.    Law and Argument.**

1.    Discussion of Rule 12(b)(6) of the Federal Rules of Civil Procedure.

"A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 78 S. Ct. 99, 102, 355 U.S. 41, 45-46 (1957).

7

"The facts of the Complaint must be viewed in [their] most favorable light . . . albeit without precise delineation or citation to chapter and verse." <u>Henrio v. Federal Deposit Insurance Corporation</u>, 996 F.2d 429, 435 (1st Cir. 1993).

Dismissal is appropriate only "[i]f a trial court accepts plaintiff's facts and can envision no reasonable application of the law that would entitle plaintiff to relief." <u>Finnern v. Sunday River Skiway Corp</u>., 984 F.2d 530, 534 (1st Cir. 1993) (Emphasis added).

The Court must accept "all well-pleaded allegations in the complaint, and draw  all reasonable inferences in favor of the plaintiff." <u>Edwards v. John Hancock Mutual Life Insurance Company</u>, 973 F.2d 1027, 1028 (1st Cir. 1992).

Rule 12(b)(6) dismissal is appropriate "only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." <u>Correa-Martinez v. Arrillaga-Belendez</u>, 903 F.2d 49, 52 (1st Cir. 1990).

The complaint filed by the Plaintiff easily meets the requirements for its survival.

    i.   <u>The Plaintiff's Refund Count</u>.

The facts as alleged by the Defendant relative to the Plaintiff's refund count are not in dispute.


The infirmity of the Defendant's arguments relative to the

8

Service's statement to the Plaintiff are exposed by the clear terms of the Service's document.

There are many instances in the law where parties agree to litigate in a forum. These include, but are not limited to, forum selection clauses, arbitration clauses and the consent by parties to the jurisdiction of a Court. For the issue of consent please see <u>Neirbo Co. v. Bethlehem Corp.</u>, 308 U.S. 165 (1939) and <u>Marcial Ucin, S.A. v. SS Galicia</u>, 723 F.2d 994 (1st Cir. 1983)

Additionally, it is (widely) reported that the United States accepts the nominal payment of $100. in IRC § 6672 matters as being sufficient for the purposes of establishing jurisdiction with the District Court. Please see Robert E. McKenzie, <u>Representation Before the Collection Division of the IRS</u>, Section 7-16.30 (1997). The jurisdictional requirements are the same for excise taxes and employment taxes ("divisible taxes"). Please see <u>Flora v. United States</u>, 362 U.S. 145 (1962).

There is no apparent reported precedent where a Court has sua sponte dismissed a matter over concerns with the jurisdictional payment.

It is not appropriate for the United States to make a statement, which it would assuredly argue granted the Plaintiff rights if such an argument was convenient to its position, and thereafter complain that the Plaintiff did as instructed.

9

The Plaintiff respectfully requests that the Court adopt the standard enunciated by the Supreme Judicial Court for the Commonwealth of Massachusetts in <u>Commissioner of Revenue v. Baybank Middlesex</u>, 421 Mass. 736, 659 N.E.2D 1186 (1996). In <u>Baybank</u>, the Commissioner had issued an "Instruction Sheet" for bank excise tax returns. The Commissioner issued an audit assessment predicated on a view of the law which was inapposite to his written instructions.

The Supreme Judicial Court ruled that "although courts give the force of law only to formal agency regulations, administrative agencies must abide by their own internally promulgated policies."  The Court citing <u>Broadway Nat'l Bank v. Commissioner of Corps. & Taxation</u>, 321 Mass. 25, 30 (1947) (interpreting bank excise tax provision in light of commissioner's prior position, not a recently adopted contrary one).  The Court additionally stating "This is true regardless whether the policy exists pursuant to a formal rule, <u>Royce v. Commissioner of Correction</u>, 390 Mass. 425, 427 (1983), or an informal guideline, <u>Macioci v. Commissioner of Revenue</u>, 386 Mass. 752, 763 (1982) (guidelines to local assessors for developing new real property classification schemes).  See <u>Assessors of Holyoke v. State Tax Comm'n</u>, 355 Mass. 223, 243-244 (1969) (ruling with respect to proper tax classification of a particular business entity). "Instructions that explain and guide the taxpaying

10

public through the revenue laws are no different.  830 Code Mass. Regs. 62C.3.1 (9) (1993).  Cf. <u>First Fed. Sav. & Loan Ass'n v. State Tax Comm'n</u>, 372 Mass. 478, 485 (1977) (tax return instructions express commissioner's view), aff'd, 437 U.S. 255 (1978).

The Court held that the Commissioner was to abide by his instructions. The United States is properly held to its own written statements.

ii.  <u>The Duty of Consistency and Equal Protection Count</u>.

The Courts have had limited opportunity to review tax matters where the United States acts in a manner which discriminates against a taxpayer to the benefit of its competitors. The holdings on this issue support the proposition maintained by the Plaintiff.

In <u>Sirbo Holdings Inc. v. Commissioner of Internal Revenue</u>, 476 F.2d 981 (2nd Cir.1973) the issue before the Court was whether a payment by a tenant to its landlord in satisfaction of the tenant's obligation to restore leased premises to their pre-lease condition was entitled to long-term capital gains treatment.

In overturning the Tax Court's decision the Second Circuit Court of Appeals stated as follows:

> What makes a hard case even harder is the following: Two months after the decision here, Judge Raum of the Tax Court accorded capital gains treatment to a payment almost identical in nature.  <u>Boston Fish Market Corp</u>., 57 T. C. 884

11

(1972). Sirbo immediately moved for reconsideration, but its motion was denied without a word of explanation.

The government does not assert any pertinent distinction between the facts of the two cases; rather, it seeks to explain the disparate results on the ground that the taxpayer's contention in Boston Fish Market was that the lessee's payment was not income at all in the light of the provision of I. R. C. § 109 excluding from gross income the value of a lessee's improvements to which the lessor falls heir on the termination of a lease and, once that point was decided against the taxpayer, the Commissioner abandoned his challenge to the propriety of capital gains treatment, See 57 T. C. at 887 n. 2. The attempted explanation does not explain, for two reasons.

**The first is that the Commissioner has a duty of consistency toward similarly situated taxpayers; he cannot properly concede capital gains treatment in one case and, without adequate explanation, dispute it in another having seemingly identical facts which is pending at the same time.** [Emphasis added.] Compare Moog Industries, Inc. v. FTC, 355 U.S. 411, 414, 2 L. Ed. 2d 370,78 S. Ct. 377 (1958), with FTC v. Universal-Rundle Corp., 387 U.S. 244, 250-52, 18 L. Ed. 2d 749, 87 S. Ct. 1622 (1967); K. C. Davis, Discretionary Justice: A Preliminary Inquiry, Ch. VII (1969); L. Jaffe, Judicial Control of Administrative Action 700 (1965). That the Commissioner's seeming inconsistency may have arisen from the right hand's ignorance of the posture of the left is little solace to taxpayers who are entitled to a non-discriminatory administration of the tax laws by him, much less to a taxpayer like Sirbo who is disadvantaged by the discrimination in its case....

Similarly, in IBM v. United States, 343 F.2d 914 (Cls. Ct. 1965), the Plaintiff, IBM, sought to recover excise taxes paid on business machines from 1951 through January 1958. It alleged that the discriminatory treatment accorded to it in contrast with the treatment accorded Remington Rand in connection with excise tax liability for identical machines during the same period.

In the early 1950's, IBM ("the taxpayer") and Remington Rand were the two competitors in the manufacture, sale, and leasing of larger electronic computing systems. Prior to mid-April 1955, both companies paid the relevant excise tax.  On April 13, 1955, Remington Rand requested a ruling from the Internal Revenue Service that "certain of its computing devices (including the Univac 120 and 60) were not subject to this tax."  The Service issued a favorable ruling two days later.

IBM requested the same ruling on July 13, 1955 for machines which were "identical in all significant respects with" Remington Rands' machines.

The Service did not act on IBM's request for a ruling for over two years. During that time the Service paid a refund to Remington Rand of "over $86,000" of the excise taxes.

Also during this time, IBM paid the tax while Remington Rand did not.

In 1957, the Service revoked its ruling to Remington Rand and held that beginning in February of 1958 that taxes were to be paid.  IBM sued for a refund.

After addressing jurisdictional arguments made by the United States the Court found that IBM was entitled to a refund.

The Court stated at pages 919 through 920:

Congress can direct the Service and the courts to take account, in a specified area, of discrimination, of equality of treatment, and of the tax burdens imposed on competitors or persons in the same or a comparable

13

situation.  Where that is what Congress has declared, the
policy of the tax law emphasizes, in that particular sector
more than in the rest of the tax field, the component of
equal treatment; courts are then bound to vindicate that
special interest just as they are, generally, to see that
the uniform taxes Congress has sought to levy are paid.
Curbing tax collection in the interest of equality, where
Congress has so decreed, is as much a part of the
Internal Revenue laws as the affirmative exaction of taxes.
As Judge Learned Hand said in a similar connection, "the
notion that the 'policy of a statute' does not inhere
as much in its limitations as in its affirmations, is
untenable." Borella v. Borden Co., 145 F. 2d 63, 65 (C.A.
2, 1944), aff'd, 325 U.S. 679 (1945).
                              . . .
Implicit, too, in the  Congressional award of discretion to
the Service, through Section 7805(b), is the power as well
as the obligation to consider the totality of the
circumstances surrounding the handing down of a ruling --
including the comparative or differential effect on the
other taxpayers in the same class.  "The Commissioner cannot
tax one and not tax another without some rational basis for
the difference." United States v. Kaiser, 363 U.S. 299, 308
(1960) (Frankfurter, J., concurring).  This factor has come
to be recognized as central to the administration of the
section. See Automobile Club of Michigan v. Commissioner,
353 U.S. 180, 185-86 (1957); Exchange Parts Co. v. United
States,150 Ct. Cl. 538, 543, 279 F. 2d 251, 254 (1960);
Connecticut Ry. & Lighting Co. v. United States, 135 Ct. Cl.
650, 653-54, 142 F. Supp. 907, 908-09 (1956); Wolinsky v.
United States, 271 F. 2d 865, 868 (2d Cir., 1959); Weller v.
Commissioner, 270 F. 2d 294, 299 (3d Cir., 1959), cert.
denied, 364 U.S. 908 (1960); Goodstein v. Commissioner, 267
F. 2d 127,132 (1st Cir., 1959); City Loan & Savings Co. v.
United States, 177 F. Supp. 843, 851 (N.D. Ohio, 1959),
aff'd, 287 F. 2d 612, 616 (6th Cir. 1961).  Equality of
treatment is so dominant in our understanding of justice
that discretion, where it is allowed a role, must pay the
strictest heed.

In both IBM and Sirbo, the Courts found that the Service has

a duty to act consistently and cannot treat similarly situated

taxpayers disparately.  In particular, when dealing with direct

competitors it "is peculiarly essential to free and fair

competition" to treat them similarly for tax purposes".  <u>IBM</u> at 923.

While these holdings speak to IRC § 7805, they are equally applicable to IRC § 7602.  The United States cannot apply excise tax to one similarly situated taxpayer and not another under its broad audit authority of IRC § 7602.

Lastly, it is extraordinary for any government to knowingly act in a way which discriminates against its own citizens. Here, there is no dispute that a Canadian manufacturer, who sells in the United States, would be the primary beneficiary of the United States actions.

     iii. <u>The Defendant Relies on Precedents Which Do Not Advance Its Position</u>.

The United States in its memorandum, at page 4, relies on the holdings in <u>Florida Power & Light Co. v. United States</u>, 375 f.3d 1119 (Fed. Cir. 2004) and <u>Hanover Bank v. Commissioner Internal Revenue</u>, 369 U.S. 672 (1962).

These precedents stand for the proposition that a taxpayer cannot rely on a private letter ruling given to another taxpayer.

These precedents are in accord with the First Circuit Court of Appeals holding in <u>Goodstein v. Commissioner</u>, supra, wherein it stated:

> But to hold that the Commissioner is bound by rulings
> specifically addressed to a taxpayer other than the one
> whose return is questioned would severely limit the
> usefulness of the long established practice of private
> administrative rulings.  * * * We are of the opinion that

the Tax Court was correct in holding that insofar as * * * no individual ruling to the contrary was ever issued to the taxpayer, he cannot now assert that the Commissioner committed error in his retroactive application of the published ruling.

Here the taxpayer is not relying on a ruling issued to another taxpayer. Hostar maintains that the United States is bound to treat it as it does its competitors. Its failure to do so precludes it from acting solely against Hostar.

The United States is fully empowered to level the playing field by IRC § 7602. In the event that it is determined that the tax is properly to be paid by the taxpayer and its competitors the United States is required to treat all of the taxpayers in the same manner.

**III. <u>Conclusion.</u>**

The United States motion is properly denied.

                              Hostar Marine Transport
                              Systems, Inc., by its
                              attorney,


                               <u>/s/ Timothy Burke</u>
                              Timothy Burke
                              Burke & Associates
                              400 Washington Street
                              Braintree, MA 02184
                              (781)-380-0770

Dated:  March 29, 2005

16

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was
served upon each attorney of record via first class mail on March
29, 2005.

                             /s/ Timothy Burke

ADDENDUM

Bill of Rights has limited the IRS ability to arbitrarily rescind installment payment plans.[11] An installment agreement will remain in effect unless:

(1) The taxpayer provided inaccurate or incomplete information; or

(2) The IRS declares a jeopardy under the jeopardy provisions; or

(3) There is subsequent change in financial condition [IRC § 6159]. A substantial change in financial condition requires that the IRS give the taxpayer at least 30 days notice of the changes which warrant termination or modification of the agreement.

## 7—16    REFUND SUITS

**7—16.10**   On those occasions where the taxpayer is unable to resolve a tax liability utilizing administrative channels, his or her only recourse may be to file a refund suit. A taxpayer might have to follow this procedure if, for example, he or she failed to file his or her Tax Court petition within the allotted days. The taxpayer will always have to proceed judicially via a refund suit in the case of a Trust Fund Recovery Penalty because the Tax Court does not have jurisdiction over such matters.

### Forum and Jurisdiction

**7—16.20**   Such suits may be brought either in the Federal District Court or in the United States Claims Court [IRC § 7442].[12] The taxpayer's lawyer must determine which of these two forums is best for his or her client.

### Payment of Tax Liability

**7—16.30**   In order to have jurisdiction over a refund suit, the taxpayer must have paid the tax liability. With respect to income taxes, this requirement has been held to require the taxpayer to pay the entire tax liability, including statutory additions, prior to initiation of any administrative claim procedure. With respect to Trust Fund Recovery Penalties, the Courts have allowed such refund claims if the taxpayer has paid the tax liability due for one employee for one period. Normally the payment of $100 has been held to be sufficient.

### Limitation Periods

**7—16.40**   The claim must be filed within two years of payment.[12.50] A refund suit may not be commenced prior to the expiration of six months after the date of filing a claim for refund (Form 843) unless the claim has been rejected in whole or in part by the IRS during the six-month period. If the claim is rejected, a suit must be commenced within two years from the date of the mailing of the notice of disallowance [IRC § 6532(a)(1)].

### Settlement Criteria

**7—16.50**   Although the initiation of a refund suit does not automatically grant the tax-payer the right to seek injunctive relief from collection actions by the IRS, the IRS

© 1995 Clark Boardman Callaghan    Pub 3/95